1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9    Merri M. Wait,                       )     No. CV-12-0783-PHX-SMM
                                          )
10              Plaintiff,                )
                                          )
11   vs.                                  )     **MEMORANDUM OF DECISION**
                                          )              **AND ORDER**
12                                        )
     Carolyn W. Colvin, Commissioner of  )
13   Social Security,                     )
                                          )
14              Defendant.                )
     ─────────────────────────────────   )

15

16        Merri M. Wait seeks judicial review under 42 U.S.C. § 405(g) of the final decision

17   of the Commissioner of Social Security ("Commissioner"), which denied her application for

18   disability insurance benefits under the Social Security Act. (Doc. 1.)[1]  Wait asks the Court

19   to vacate the Commissioner's denial.  (Doc. 17.)  The Commissioner filed her Opposition

20   Brief (Doc. 21), and Wait filed her Reply (Doc. 25).   Because the decision of the

21   Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on

22   harmful legal error, the Commissioner's decision will be affirmed.

23                              **BACKGROUND**

24        Wait was born in 1955 and has a high school education.  (Tr. 33.)  From 1988 to

25   2005, Wait was employed as an administrative manager in a human resources department,

26   ───────────────────────

27        [1]"Doc." refers to the documents in this Court's file.  "Tr." refers to the administrative
     transcript.  A certified copy of the administrative transcript was provided to this Court by the
28   Commissioner of the Social Security Administration on September 21, 2012. (See Doc. 10.)

retiring in 2005 and moving from Illinois to Arizona.  (Tr. 53-54, 153-54, 278.)  Wait's application for disability insurance is based on an alleged physical impairment due to degenerative disc disease post 2 back surgeries (1992 and 2008) and a depression-related mental impairment.  (Tr. 15-17.)

On July 2, 2009, Wait applied for social security disability insurance benefits pursuant to 42 U.S.C. §§ 401-33.  (Tr. 13.)  Wait alleged that she became disabled as of September 1, 2005 (otherwise referred to as "disability onset date").  (Tr. 13.)  The ALJ found that the Wait's date last insured was December 31, 2010.  (Tr. 13); see Vincent v. Heckler, 739 F.2d 1393, 1394 (9th Cir. 1984) (per curiam) (holding that only disability existing before date last insured establishes entitlement to disability insurance benefits).  On October 16, 2009, Wait's disability application was denied initially, and upon reconsideration on April 21, 2010.  (Tr. 13, 62-63.)  Wait sought further review before an ALJ.  (Tr. 73-76.)  On November 9, 2011, the ALJ held a hearing at which Wait and Vocational Expert Mark J. Kelman appeared and testified.  (Tr. 13.)  At the hearing, Wait amended her alleged disability onset date to March 1, 2008.  (Tr. 31, 35.)  On November 16, 2011, the ALJ found that Wait was not disabled. (Tr. 10-21.)  This decision became the Commissioner's final decision when the Social Security Appeals Council denied review. (Tr. 1-5.)

**STANDARD OF REVIEW**

To qualify for Social Security disability benefits, Wait must show that she suffers from a "medically determinable physical or mental impairment" that prevents her from performing her prior work activities and any other substantial gainful employment that exists in the national economy, and that the impairment "can be expected to result in death or [] has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The district court reviews only those issues raised by the party challenging the ALJ's decision.  See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  When reviewing a

1    Social Security appeal, the Commissioner's decision must be affirmed if it is supported by

2    substantial evidence and she applied the correct legal standards.  See Batson v. Comm'r of

3    Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004); Benton v. Barnhart, 331 F.3d 1030,

4    1035 (9th Cir. 2003). When reviewing the Commissioner's factual determinations, acting

5    through the ALJ, this Court will affirm if there is substantial evidence supporting those

6    determinations. See Celaya v. Halter, 332 F.3d 1177, 1180 (9th Cir. 2003); Saelee v. Chater,

7    94 F.3d 520, 521 (9th Cir. 1996).  Substantial evidence is more than a mere scintilla, but less

8    than a preponderance.  See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir.

9    2003); Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).  Substantial evidence is

10   relevant evidence which a reasonable person might accept as adequate to support a

11   conclusion based on the entire record.  Howard, 341 F.3d at 1011; Morgan v. Comm'r of

12   Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).  If the evidence can reasonably support

13   either affirming or  reversing the Commissioner's conclusion, the Court may not substitute

14   its judgment for that of the Commissioner.  See Batson, 359 F.3d at 1193; McCartey v.

15   Massanari, 298 F.3d 1072, 1075 (9th Cir. 2002).

16        The ALJ is responsible for determining credibility, resolving conflicts in medical

17   testimony, and for resolving ambiguities.  See Benton, 331 F.3d at 1040; Edlund v.

18   Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001).  The ALJ's legal determinations are

19   reviewed de novo, although deference is owed to a reasonable construction of the applicable

20   statutes.  See Edlund, 253 F.3d at 1156; McNatt v. Apfel, 201 F.3d 1084, 1087 (9th Cir.

21   2000).

22                    **COMMISSIONER'S DISABILITY EVALUATION PROCESS**

23        Social Security regulations prescribe a five-step evaluation process for an ALJ to

24   determine if a claimant is disabled within the meaning of the Social Security Act.  See

25   Batson, 359 F.3d at 1190, 1194; 20 C.F.R. § 404.1520.  At step one, the ALJ determines if

26   the claimant is presently engaged in substantial gainful activity.  See 20 C.F.R. §

27   404.1520(b). If the claimant is engaged in substantial gainful activity, then she is not

28                                        - 3 -

disabled.  If not, the ALJ moves to step two to determine if the claimant has impairments or combinations of impairments that significantly limit the claimant's physical or mental ability to do basic work activities and are thus "severe" within the meaning of the regulation.  See id. § 404.1520(c).  At the third step, the ALJ evaluates if the claimant's impairment meets or medically equals the criteria of a listed impairment found in Appendix 1 of Subpart P of Regulation No. 404.  If yes, and the impairment meets the requirements for duration under 20 C.F.R. § 404.1509, the claimant is disabled.  If the claimant fails to meet or equal the criteria or fails the duration requirement, the ALJ's analysis moves to step four.  See 20 C.F.R. § 404.1520(e).  Under step four, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the continued ability of the claimant to perform physical or mental work activities despite her impairment or combination of impairments.  See id.  The ALJ also determines if the claimant's RFC allows her to perform past relevant work.  See id. § 404.1520(f).  If yes, the claimant is not disabled.  If not, the analysis proceeds to a fifth step where the burden shifts to the Commissioner to demonstrate that the claimant is not disabled by presenting evidence that the claimant retains sufficient RFC to adjust to perform other jobs that exist in significant numbers either in the region where the claimant lives or in several regions of the country.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(g).

## DISCUSSION

### A.  ALJ Rationale

The ALJ found that Wait had not engaged in substantial gainful activity since September 1, 2005, the original disability onset date, and therefore also Wait's amended disability onset date of March 1, 2008.  (Tr. 15.)  At step two, the ALJ determined that Wait's alleged depression-related mental impairment was not severe.  (Tr. 15-17.)  At step two, the ALJ found that Wait did establish the following "severe" impairment: degenerative disc disease post 2 back surgeries (1992 and 2008).  (Tr. 15.)  Wait had the following RFC:

sedentary work[2] "with the following exceptions: no climbing ladders, ropes, or scaffolds; can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; should avoid concentrated exposure to machinery and unprotected heights." (Tr. 17.)  Based upon Wait's RFC, the ALJ determined at step four that she was able to perform her past relevant work as an administrative manager, which was a sedentary job.  (Tr. 20-21.)  The ALJ rejected Wait's subjective symptom testimony that she could not work.  (Tr. 17-19.)  The ALJ credited the vocational expert's testimony that Wait was able perform her past relevant work as an administrative manager.  (Tr. 20-21.)  Therefore, the ALJ found that Wait was not disabled from her amended disability onset date, March 1, 2008, through the date she was last insured, December 31, 2010.  (Tr. 21, 31, 35.)

### B. Opinion Evidence

The ALJ found conflicting medical opinion evidence in this case.  (Tr. 19-20.)  In addition to reviewing the evidence from treating physician Drs. Doerr, Grove, Allred and Trost, the ALJ reviewed the medical evaluations of numerous examining and non-examining agency physicians.  (Id.)  The opinions of the treating physicians were contradicted by the opinions of Drs. Broky (Tr. 380-84) and McPhee (Tr. 387-91) as well as other state agency physicians (Tr. 363-70, 413, 420-21).  The ALJ rejected the opinions of Drs. Doerr, Grove and Allred, favoring the opinions of the examining and non-examining state agency doctors.

Wait argues that the ALJ erred by failing to properly weigh the reports submitted by her treating physicians, Drs. Todd Doerr, Julian Grove and Dee Allred.  (Doc. 17 at 14-18.)  Subsequent to Wait's last insured date and shortly before the ALJ hearing in November 2011, in September and October 2011, Drs. Doerr, Grove and Allred submitted their opinion

---

[2]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

1   that Wait can sit for less than two hours in an eight-hour work day, and stand/walk less than

2   two hours in an eight-hour work day.  (Tr. 439, 482, 484.)  Dr. Doerr opined that Wait

3   suffers pain and leg numbness to a severe  degree. (Tr. 440.)  Dr. Grove opined that Wait

4   suffers chronic pain and weakness to a moderately severe degree, and that a lumbar revision

5   surgery for Wait was being tentatively scheduled. (Tr. 483.)  Dr. Allred opined that Wait

6   suffers fatigue and drowsiness to a moderately severe degree.  (Tr. 485.)  Based upon the

7   exertional limitations opined to by these physicians, at the hearing Vocational Expert Mark

8   Kelman testified that such limitations would preclude Wait from sustaining full-time work.

9   (Tr. 58.)

10           The Commissioner gives more weight to opinions from treating doctors  since these

11  doctors are likely to be the medical professionals most able to provide a detailed,

12  longitudinal picture of a claimant's medical impairments. See 20 C.F.R. § 404.1527(c).  So

13  long as the opinion is well-supported by medically acceptable clinical and laboratory

14  diagnostic techniques and is not inconsistent with the other substantial evidence in the

15  record, the opinion will be given controlling weight. Id.; see Lester v. Chater, 81 F.3d 821,

16  830-31 (9th Cir. 1995) (stating that the opinion of a treating doctor, even if contradicted by

17  another doctor, can only be rejected for specific and legitimate reasons).

18           1.  ALJ's Reasons for Rejecting  Doerr, Grove and Allred Evidence

19           The Commissioner contends that the ALJ properly gave the opinions of Drs. Doerr,

20  Grove and Allred less weight because they were submitted well after the Wait's date last

21  insured, December 31, 2010.  (Doc. 21 at 14-15.)  In order to establish the context for

22  resolving this argument, the Court will review the relevant medical evaluations submitted

23  subsequent to Wait's March 1, 2008 amended disability onset date.

24           After Wait retired in 2005 and moved to Arizona, the record shows that Dr. Trost

25  regularly treated her from 2006 until he closed his practice in late 2010. (Tr. 278, 486.)  In

26  early 2008, due to chronic back pain, Dr. Trost referred Wait to a specialist for a surgery

27  consultation.  (Tr. 307-12.)  Wait consulted with Dr. Curtis Dickman and ultimately had

28

back surgery in July 2008. (Tr. 247-57.) Wait continued post-operation treatment from Dr. Dickman and also returned to treatment with Dr. Trost. (Tr. 326-31.) Dr. Dickman opined that Wait was making a satisfactory recovery and had normal strength in her legs. (Tr. 241-44.)

In April and May 2009, Wait reported to Dr. Trost that she was improving, moving around better, getting exercise, felt great, and had less neuropathic pain. (Tr. 319, 335-36.) In June 2009, Wait reported to Dr. Trost worse than usual right hip pain and continued back pain. (Tr. 323.) Ten days later, Wait had a lumbosacral spine x-ray which showed no change when compared to her November 2008 x-rays. (Tr. 582.) She also underwent a pelvic and right hip x-ray, which were normal. (Tr. 583.)

On July 2, 2009, Wait filed her application for disability. (Tr. 13.) Following Wait's application, Dr. Trost wrote a letter to the Commissioner stating that Wait's medical problems incapacitated her and rendered her unable to work. (Tr. 275.) Specifically, Wait had localized back pain and spasm secondary to disc disease. (Tr. 277.) Dr. Trost stated that Wait's back pain and her medications prevent her from holding a job. (Tr. 275.) Dr. Trost acknowledged some improvement in Wait's condition since surgery but also noted right lateral foot numbness. (Id.) However, Dr. Trost also specifically requested that the Commissioner obtain an independent unbiased assessment of Wait's condition due to his close relationship with his patients, especially Wait, whom he saw frequently. (Tr. 277.)

On August 26, 2009, Wayne Broky, M.D., a board certified specialist in physical medicine and rehabilitation, performed a complete physical examination of Wait at the request of the state agency. Dr. Broky diagnosed multilevel lumbar degenerative disc disease and other back-related issues. (Tr. 378-80.) Based on Wait's physical examination, Dr. Broky found that Wait could lift 20 pounds occasionally and 10 pounds frequently, stand/walk for at least two hours but less than six hours in an eight-hour workday, and sit for six to eight hours in an eight-hour day. (Tr. 380-84.)

On September 26, 2009, Mikhail Bargan, M.D., a state agency physician, reviewed

the evidence and found that Wait could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours in an eight-hour workday, and sit for about six hours in an eight-hour day. (Tr. 363-70.) According to Dr. Bargan, Wait could perform the exertional demands of light work that did not require climbing of ladders, ropes, or scaffolds, or more than occasional crouching and crawling. (Id.)

On January 29, 2010, Wait returned to Dr. Trost with complaints of knee pain from exercising. She reported climbing Pinnacle Peak "quite frequently" and her knee pain was "more severe when she was climbing." (Tr. 523.) She felt her "overall combination for pain management [was] working." She was "pushing herself with exercise" and "jogging a bit." (Id.)

On March 2, 2010, Lucia McPhee, M.D., a second board certified specialist in physical medicine and rehabilitation, examined Wait at the request of the state agency. Wait complained of worsening pain and degenerative disc disease. In addition to her own examination of Wait, Dr. McPhee reviewed Wait's medical records, including the report of Dr. Broky and the letter of Dr. Trost. (Tr. 385-87.) Dr. McPhee diagnosed history of decompression and fusion from the back surgery, chronic low back pain, and other back related issues. (Id.) Dr. McPhee found that Wait could lift 20 pounds occasionally and less than 10 pounds frequently. In an eight-hour workday, Dr. McPhee found Wait could stand/ walk for about four hours, sit for an "estimated" four to five hours, and occasionally climb, stoop, crouch, and crawl. (Tr. 387-91.)

On March 18, 2010, Dr. William Backlund, a non-examining state agency expert reviewed the RFC findings made by Drs. Broky and McPhee regarding Wait, noted the lack of significant changes in Wait's condition between the two exams, and agreed with the RFC assessment. (Tr. 413.) On April 6, 2010, Dr. Jack Kundin, a second non-examining state agency expert also reviewed and concurred with Dr. Broky's and Dr. McPhee's RFC findings for Wait. (Tr. 420-21.)

On April 28, 2010, Wait told Dr. Trost she "recently returned from Chicago" and she

was "doing well" overall.  She was "tolerating her medications" and would be "traveling to Chicago about every 3 months." (Tr. 509.)  On May 6, 2010, Wait told Dr. Trost that she "increased her exercise and [was] doing more yard work."  She "fe[lt] very comfortable where she [was] currently."  Dr. Trost told Wait to decrease her physical activity and "not to overdo it as this [was] contributing to her pain." (Tr. 508.)  On May 26, 2010, Wait told Dr. Trost her "pain [was] manageable." (Tr. 500.)  On June 7, 2010, Dr. Trost noted Wait had a "[large] amount going on in life" and was "doing ok[ay]." (Tr. 498.)  On October 7, 2010, Dr. Trost found Wait had "grossly intact" sensation, moved all extremities symmetrically, and had normal reflexes. (Tr. 486-87.)

After Dr. Trost closed his practice, on October 27, 2010, Wait went to Dr. Dee Allred complaining of low back pain. (Tr. 449-50.)  Dr. Allred found Wait had pain with extension and flexion in her low back. The following month, Wait informed Dr. Allred that she was going to Chicago to see her mother.

Wait's date last insured expired on December 31, 2010.  Subsequently, in early 2011, she began pain treatment with Dr. Grove.  Wait indicated that she wanted to wean off the narcotic drugs she was taking because she did not believe they were helping. (Tr. 475.)  On August 4, 2011, she began treatment with Dr. Doerr, a surgeon.  On August 22, 2011, Dr. Doerr recommended additional surgery. (Tr. 430.)

In September and October 2011, Drs. Doerr, Grove and Allred submitted their RFC assessments finding that Wait could not work eight hours per day, five days per week on a regular and consistent basis. (Tr. 439-40, 482-85.)  They stated Wait could lift and carry less than 10 pounds and sit and stand/walk for less than two hours each in an eight-hour workday.  Wait could not bend, crawl, climb, stoop, balance, crouch, or kneel, but occasionally use her feet and reach. (Id.)

*Analysis*

Relying on Macri v. Chater, 93 F.3d 540, 545 (9th Cir. 1996), the Commissioner argues that the ALJ properly found that the medical assessment of a doctor who examines

1    and physically assesses a claimant after the expiration of her  disability insured status is

2    entitled to less weight than the assessment of a doctor who completed a contemporaneous

3    exam. (Doc. 21 at 15.)

4          The record establishes that Drs. Broky and McPhee, both board certified specialists,

5    completed contemporaneous RFC assessments, while the assessments submitted by Drs.

6    Doerr, Grove and Allred were all submitted after the expiration of Wait's disability insured

7    status.  In this case, Macri supports the Commissioner's argument that the ALJ properly

8    discounted the assessments made by Drs. Doerr, Grove and Allred.

9          In addition, the ALJ found that the opinions of Drs. Doerr, Grove and Allred were

10   inconsistent with the overall medical record as a whole.  The ALJ summarized his findings

11   as follows:

12            [T]he objective medical evidence does not support the alleged severity of
              symptoms.  The claimant had good recovery from her back surgeries and has
13            continuously engaged in relatively normal activities of daily living.  She also
              indicated that she retired from her previous work as a manager after she and
14            her husband moved to Arizona when he retired.  She did not quit because of
              her impairments and the medical evidence does not support a significant
15            worsening in her condition since she worked.  Therefore, I find the claimant
              has not been deprived of the ability to perform work subject to the residual
16            functional capacity assessed by this decision for any 12-month period since
              the alleged onset date.
17

18   (Tr. 20.) The Court finds that substantial evidence supports the ALJ's findings rejecting the

19   opinions of Drs. Doerr, Grove and Allred as being inconsistent with Wait's overall medical

20   record.  See 20 C.F.R. § 404.1527(c)(4) (stating that an ALJ must consider whether an

21   opinion is consistent with the record as a whole); Batson, 359 F.3d at 1195 (stating that an

22   ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported

23   by the record as a whole, or by objective medical findings).   For instance, the

24   contemporaneous progress reports submitted by Dr. Trost are inconsistent with the findings

25   reached by Drs. Doerr, Grove and Allred.  On May 26, 2010, Wait told Dr. Trost her "pain

26   [was] manageable."  (Tr. 500.) On June 7, 2010, Dr. Trost noted Wait had a "[large] amount

27   going on in life" and was "doing ok[ay]."  (Tr. 498.)  On October 7, 2010, Dr. Trost found

28

1   Wait had "grossly intact" sensation, moved all extremities symmetrically, and had normal

2   reflexes.  (Tr. 486-87.)

3       Further, the overall medical record supports the ALJ's RFC findings and the weight

4   he gave to the reports of Drs. Broky and McPhee.  (Tr. 19; see Tr. 378-84, 363-70, 385-91,

5   413, 420-21.)  Dr. Broky found that Wait had a normal gait and could tandem walk, walk

6   on her tiptoes and heels, and do a full squat and rise again.  Wait had "some" weakness when

7   rising on her toes, had normal reflexes, and no paravertebral muscle spasms.  Wait had

8   normal ranges of motion in her cervical spine, shoulder, elbows, wrists, and fingers, full

9   rotation in each hip, full flexion and extension of each knee, and full ranges of motion in her

10  ankles.  (Tr. 378-80.)  Dr. Broky found Wait had full strength throughout and negative

11  straight leg raising tests.  (Id.)  As previously summarized, Dr. Broky assessed that Wait

12  could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for at least

13  two hours but less than six hours in an eight-hour workday, and sit for six to eight hours in

14  an eight-hour workday. (Tr. 380-84.)

15      Dr. McPhee found that Wait walked with an unremarkable gait. She could walk on

16  her heels and toes and perform tandem walking. She could crouch independently and had

17  normal reflexes (except for absent right and trace left Achilles' reflexes). Wait had normal

18  extremity ranges of motion. She had negative straight leg raising tests, normal extremity

19  strength, and intact sensation (except for decreased sensation to the right calf and foot).  Wait

20  also had only "minimal" tenderness across her lumbar paraspinal regions on her right side.

21  (Tr. 385-87.)  As previously summarized, Dr. McPhee assessed that Wait could lift 20

22  pounds occasionally and 10 pounds frequently, and stand/walk and sit for an "estimated"

23  four to five hours each in an eight-hour workday.  (Tr. 387-91.)  Thus, the ALJ properly

24  considered and rejected the opinions of Drs. Doerr, Grove and Allred in light of the

25  substantial medical evidence supporting the ALJ's RFC assessment.

26      2.  Dr. Trost

27      Wait also argues that the ALJ erred by failing to discuss the opinion of her first

28

1    treating physician, Dr. Evan Trost. (Doc. 17 at 18-19.) Citing SSR 96-8p, Wait argues that

2    the ALJ was required to explain his disposition regarding the opinions stated by Dr. Trost.

3    (Id.)

4            It was error for the ALJ not to discuss the letter Dr. Trost wrote to the Commissioner

5    on behalf of Wait. (Tr. 275-77.) However, the Court must consider whether such error was

6    harmful legal error. See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("the burden of

7    showing that an error is harmful normally falls upon the party attacking the agency's

8    determination") (further citation omitted); Molina v. Astrue, 674 F.3d 1104, 1115-16 (9th

9    Cir. 2012) ("[A]n ALJ's error is harmless where it is inconsequential to the ultimate

10   nondisability determination" and courts must consider "the record as a whole to determine

11   whether the error alters the outcome of the case.") (further citation omitted). The Court finds

12   that it was harmless error for the ALJ not to discuss Dr. Trost's treatment of Wait because

13   Dr. Trost specifically requested that the Commissioner obtain an independent unbiased

14   assessment of Wait's condition due to his close relationship with his patients, especially

15   Wait, whom he saw frequently. (Tr. 275-77.) Further, the context of Dr. Trost's own

16   treatment record with Wait establishes that she was not disabled at the time he wrote the

17   letter. For instance, six months after stating that Wait was disabled and unable to work, Dr.

18   Trost reported that Wait was complaining of knee pain from exercising due to climbing

19   Pinnacle Peak "quite frequently."[3] (Tr. 523.) Thus, in considering the record as a whole,

20   the ALJ's failure to discuss Dr. Trost's report was not an error that altered the outcome of

21   the case.

22       **C. Subjective Pain Testimony**

23           The ALJ must engage in a two-step analysis to evaluate the credibility of a claimant's

24   subjective testimony. "First, the ALJ must determine whether the claimant has presented

25

26           [3]The Court takes judicial notice that Pinnacle Peak is a granite summit located in

27   Scottsdale, Arizona, rising to an elevation of 3,171 feet.

28                                          - 12 -

objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  If the claimant meets this first test, and there is no evidence of malingering, then the ALJ "can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996); see also Carmickle v. Comm. of Soc. Sec. Admin., 533 F.3d 1155, 1160 (9th Cir. 2008) (stating that an ALJ may discount the claimant's subjective statements with clear and convincing reasons supported by substantial evidence).  An ALJ may consider at least the following factors when weighing the claimant's credibility: claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between her testimony and her conduct, claimant's daily activities, her work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains. See Thomas v. Barnhart, 278 F.3d 947, 958–59 (9th Cir. 2002) (citing Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)).

Here, the ALJ found that the medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 18.)  However, the ALJ found that Wait's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. Specifically, the ALJ found as follows:

> The credibility of the claimant's allegations regarding the severity of her symptoms and limitations is diminished because those allegations are greater than expected in light of the objective evidence of record. The medical evidence indicates the claimant received routine conservative treatment for her impairments. The positive objective clinical and diagnostic findings since the alleged onset date detailed below do not support more restrictive functional limitations than those assessed herein.

(Tr. 18.)

Wait argues that the ALJ erred because he did not have sufficient reasons to discount her subjective pain testimony.  (Doc. 17 at 21-26.)

1    Given the ALJ's detailed discussion of the evidence as summarily recounted here, the

2    Court concludes that the ALJ provided specific, clear and convincing reasons for discounting

3    the extent of Wait's subjective pain testimony.  The ALJ cited the opinions of multiple

4    physicians in support of the physical limitations assessed. (Tr. 18-20; Dr. Broky, Tr. 378-80;

5    Dr. McPhee, Tr. 385-87); Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th

6    Cir. 2009) (upholding adverse credibility finding where ALJ pointed out that claimant's

7    statements at the hearing did not comport with the objective medical evidence in her medical

8    record).

9    The ALJ also found that Wait's activities of daily living undermined her subjective

10   complaints of totally debilitating symptoms. (Tr. 18, 20.)  During the relevant period, Wait

11   regularly traveled to Chicago. (Tr. 325, 333-34, 447-49, 509, 530.)  In November 2008, she

12   reported performing yard work. (Tr. 241-42.)  In April 2009, Wait reported exercising three

13   to four times per week, including "30 minutes of cardio[vascular] and 30 minutes of weight

14   training." (Tr. 335-36.)  In July 2009, Wait's husband stated that she created "yard art" and

15   painted small statues. (Tr. 177-84).  Wait further indicated that she took care of her flowers

16   and cats and painted. (Tr. 343-46.)  In January 2010, Wait reported climbing Pinnacle Peak

17   "quite frequently," was "pushing herself with exercise," and "jogging a bit."  (Tr. 523.)  In

18   March 2010, she reported feeding her cats, sometimes cleaning the litter box, and painting

19   "little things" for four to five hours per day on a periodic basis. (Tr. 392-96.)  The following

20   month, Wait reported she had "increased her exercise" and was "doing more yard work."

21   (Tr. 508.)

22   In this case, adverse credibility findings are established when a claimant's

23   self-reported activities undermined her credibility and suggest a "greater functional capacity"

24   than alleged.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).

25   The ALJ further found that Wait's subjective complaints were inconsistent with her

26   reports that her symptoms were improved with medications or other treatment. (Tr. 19.)  The

27   record establishes that in July 2008, following her surgery, Wait reported to Dr. Trost that

28

1  she was "doing well" overall. (Tr. 326.) The following month, her surgeon, Dr. Dickman,

2  noted that she had "relief of her lumbar radicular pain symptoms." (Tr. 244.) In April 2009,

3  Dr. Trost noted that Wait's chronic back pain was improving. (Tr. 335-36.) The following

4  month, Dr. Trost noted that she said she felt great. (Tr. 319.) In October 2009, Wait advised

5  Dr. Trost that her "pain [was] under good control." (Tr. 530.) In January 2010, she reported

6  that she felt her "overall combination for pain management [was] working." (Tr. 523.) The

7  following April, Wait told Dr. Trost that she was "doing well," "tolerating her medications"

8  and "fe[lt] very comfortable where she [was] currently." (Tr. 508.) Based on this record,

9  the ALJ correctly found inconsistency in Wait's subjective pain testimony. See Warre v.

10 Comm. of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("[i]mpairments that can

11 be controlled effectively with mediation are not disabling"). Thus, the Court finds that the

12 ALJ provided specific, clear and convincing reasons for discounting Wait's subjective pain

13 testimony to the extent that it conflicted with his RFC assessment.

14         **D.  Mental Impairment Evidence**

15         Finally, Wait argues that the ALJ erred by not finding that she had a severe mental

16 impairment, due to her depression-related issues. (Doc. 17 at 26-27.) Wait argues that the

17 severity of her mental impairment was supported by the consultative examination undertaken

18 by Dr. Niraja Patel, a psychiatrist. (Id.)

19         An impairment is "severe" if it "significantly limits your physical or mental ability

20 to do basic work activities." 20 C.F.R. § 404.1520(c).

21         Here, the ALJ considered Wait's mental impairments, "depression, anxiety, and

22 memory issues," but found these impairments "did not cause more than minimal limitation

23 in the claimant's ability to perform basic mental work activities and were therefore

24 nonsevere." (Tr. 15.) The ALJ reviewed mental impairment consultative examinations

25 undertaken by Dr. Patel (Tr. 343-48) and Psychologist Eliott Salk (Tr. 392-96), and three

26 additional file reviews by Psychologist Stacy Koutrakos (Tr. 349-62), Dr. Jonathan Zeuss,

27 a state agency psychiatrist (Tr. 399-412), and Dr. James Derbin, also a state agency

28

psychiatrist (Tr. 422-24).  Overall, these doctors found that Wait's mental limitations were not severe, but rather mild.  (Tr. 15-16.)  Based on the foregoing, the Court finds that substantial evidence supports the ALJ's findings that Wait did not suffer from a severe mental impairment.

Specifically with regard to Dr. Patel, although Dr. Patel did assess a GAF[4] score of 49, an indication of serious symptoms, during his examination of Wait, the ALJ thoroughly explained why he gave that subjective score little weight.

> This GAF score is inconsistent with the treatment notes from that same time period.  The claimant had relatively normal activities of daily living, had received only conservative treatment, and had no psychiatric hospitalizations. Moreover, this GAF score is inconsistent with Dr. Patel's own findings, which indicated there were essentially no issues manifested. [] For these reasons, the undersigned gives little weight to the GAF score documented in the treatment records.

(Tr. 16.) The Court finds that substantial medical evidence supports the ALJ determination regarding the weight he gave to Dr. Patel's GAF score.  The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.  See Benton, 331 F.3d at 1040.

## CONCLUSION

After a thorough review of the record, the Court finds that the ALJ applied the correct legal standards in his evaluation. The ALJ's decision demonstrates that he carefully considered Wait's application and the supporting evidence. The ALJ identified substantial evidence supporting each of his findings.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision denying Wait's

---

[4]Global assessment of functioning ("GAF") is a rating system used by the American Psychiatric Association "for reporting the clinician's judgment of the individual's overall level of functioning." A score of  41 - 50 represents serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

1    application for disability insurance benefits is **AFFIRMED**.

2          **IT IS FURTHER ORDERED** that the Clerk enter judgment in favor of Defendant

3    and terminate this action.

4          DATED this 30th day of April, 2013.

5

6

7                              Stephen M. McNamee
                              Senior United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 17 -